Martin, J.
delivered the opinion of the of the court. The plaintiffs complain, that the defendant detains thirteen slaves, the property of their insolvent.
The answer states, that these slaves were conveyed, by Fouque, long before his failure, to the defendant, for a valuable consideration, by a bill of sale, which bears date of the 22d of June, 1811, under the private signatures of the vendor and vendee.
There was a verdict and judgment for the defendant, and the plaintiff's appealed.
There is not any statement of facts, but the parish judge has certified, that the record contains all the evidence adduced in the case.
Mermet, examined by consent, deposed that, in June, 1811, it came to his knowledge, that *424 Fouque wished to purchase a plantation, and the defendant unwilling to be concerned therein, pro* posed to Fouque a settlement of their accounts. The deponent was on good terms with both, and heard the defendant ask from Fouque, the payment of a sum of $3000, and Fouque propose the sale of twelve, or fifteen slaves, for which, the defendant offered $7000 dollars, payable, $3000 in Fouque’s note, and the balance in cash. On the evening of that day, Fouque told the deponent he had concluded ail his affairs, with the defendant, his son in law, and shewed him four bags of dollars, and the defendant shewed him a bill of sale for the slaves* Fouque was th n in good credit.
- Bideau deposed that, about the same time, he was accidentally in Fouque’s store, and saw him deliver a bill of sale of fourteen slaves, to the defendant, asking him whether it had not better be done before a notary; whin the defendant answered it was unnecessary. In the afternoon, he assisted the defendant in carrying $4000, which were counted in his presence, and delivered to Fouque, as the balance of the price of the slaves.
Soulie deposed, that Fouque and the defendant, lived together, previous to the former’s failure ; that Fouque’s credit began to decline, after the purchase of Harang’s plantation, in January, *425 1812 ; that the deponent when he heard of this, still thought him in good circumstances, because, at the time he bargained with Harang, for the plantation, he exhibited, to the deponent, the state of his affairs, shewing property, to the amount of 60 or 870,000; that, in that state, there were a great number of negroes, for a person inhabiting the city, his house, a claim on a person in Pensacola, his goods in the store, and Other property. Fouque engaged to put his slaves on the plantation and some others, thirty in all, in addition to those shewn. He knows that, about three weeks before his failure, Fouque advertised the loss of thirteen notes, of S1G00 each, of the bank of Louisiana, of which the defendant was a director, and knew that no such notes were in circulation. Mrs. Vigniaud, and Fouque, her father, used to sell goods in the same store : and, at times, she bought goods for it. The defendant worked at his trade of watch maker, and kept his shop in Fouque’s house. He enjoyed credit and a good character. On the 19th of August, 1812, a violent hurricane did great injury to the plantations.
Lanna deposed that, at the end of November, 1812, he sold, as syndic of an estate, indigo to the amount of 6 or 87000, that the vendee offered Fouque, as his endorser, but the creditors, being consulted, refused to accept him as such. *426 Before that time, the deponent thought Fouque * o a in good credit. He always thought the defendant in very easy circumstances, and believed him " J .... to be a partner of rouque, from their living in the same house, and being connected by marriage.
Abat deposed, that Fouque and the defendant lived together, after the latter married the former’s daughter. Fouque enjoyed good credit, till he bought Harang's plantation, it being believed that, as he had been always occupied in retailing goods, he would not understand how to conduct a plantation. From that time his credit declined.
The plaintiff introduced the records of two notaries, by which it appeared, that Fouque took authentic bills of sale of a number of slaves, purchased by him in 1811 and 1812.
A cértified copy of the inventory of the property, surrendered by Fouque to his creditors, was also introduced, and one of the record of the bill of sale from Fouque to the defendant, as well as the bilan of Fouque and the tableau de distribution, and the deed from Harang to Fouque.
Cruzat deposed, that Fouque paid taxes, on ten slaves in town, in 1811, on eighty four, on the plantation, in 1812, and that in 1813, the defendant, for the first time, paid taxes on ten slaves in town.
*427 Girod deposed, that Fouque enjoyed good credit till after the purchase of Harang’s plantation—that the great price he gave for it, the high levee, and his reputed inability to conduct the negroes of a plantation, did affect his credit;— that Vigniaud has always been a hard working and frugal man—that, in 1792, at the death of his first wife, he was worth about 87000.
The bill of sale, from Fouque to the defendant, was recorded in George T. Ross’s office, on the 12th of July, 1812. The signatures of the vendor and vendee were admitted.
Dubois deposed, that the bill of sale is in the hand writing of Godefroy ; that the deponent arrived in New Orleans in 1809, and saw in the newspapers Godefroy’s justification ; from which, he concludes that he was already dismissed from his office of a notary public—-that, in the beginning of 1811, the deponent was employed, for about two months, in the office of Mr. Broutin, notary^ public, in which Leroux and Godefroy wrote : the latter had one fourth of the profits of the office, and remained in it, ’till he was arrested for debts and committed to prison.
Pollock deposed, that Godefroy, after he was dismissed from office, was employed by Broutin, —that his reputation was bad,* it being reported that he had acted improperly in his office.
Duncan reported that Godefroy’s character *428 was He had been charged wbh forging the will of an American, who could not speak one word of french.
It does not appear, to this court, that the judgment, in the present case is incorrect. The ne-groes were purchased, according to the bill of sale, on the 22d of June, 1811: from that instrument, it appears that they were already in the possession of the vendee, and, both the parñes to the sale being in the same house, and their fami. lies making but one, it is not extraordinary that the slaves were not removed. It does not appear that, at this period, there was any creditor of the vendor, who might be defrauded, and both parties are sworn to have been then in very easy cir-comstanees. About six months after, January 7, 1812, Fouque purchased the plantation, which appears to have been the cause of his subsequent discomfiture, and about six months after this purchase, July 11, 1812, the defendant caused this bill of sale to be recorded, and about two months after, a violent hurricane laid the plantation waste. This disaster entirely destroying the credit of Fouque, which began to decline from the date of his purchase, he was afterwards compelled to surrender his property for the benefit oi his creditors.
The plaintiffs’ counsel contends, that the test!- *429 tnony of Mermet and that of Bidaut, ought not to be noticed, because they testify to facts, which happened at the time of making the bill of sale. It is true, the law forbids the introduction of parol evidence “ against or beyond, what is contained in the acts, or on what may have been said before or at the timé of making the acts or since.” We understand this to mean that any thing, which may have been said to contradict, take from or add to the stipulations of an act, shall not be heard : but wnen an act is attacked as fraudulent, or false, parol evidence must, of necessity, be admitted on the part ot the defendants, not, indeed, to alter or modify the contents, but to support the truth of the act and the good faith of the parties. Here, the testimony, so far from going against or beyond the act, has no other object than to corroborate it. The rule then, invoked by the plaintiffs’ counsel, receives no application here.
But, independently of this, the witnesses here examined swear not to what they heard said, but what they saw done. One of them saw $4000 of the consideration money, counted and paid.
The counsel further urges, that the bill of sale was notMcknowledged, but registered, without any proof or acknowledgment of the signatures, at the request or of either of the parties, hut of Godefroy, the person who wrote it.
The law pi o vides that acts, under private sig *430 natures, for the sale of slaves, not registered, within the legal time, shall have effect against Persons, only from the time of their being registered. We are of opinion, that as, in the present case, the bill of sale is admitted by the plaintiffs, to be the act and deed of the vendor, the want of an acknowledgment, previous to the registry, if it could avail them, inany case, cannot be opposed by them in this.
There is nothing in evidence, from which a suspicion of fraud can arise against the defendant ; nothing from which it may be concluded that the vendor meant to cover his property, or even that he had any creditor that might be defrauded. Neither his subsequent ill conduct, nor the ill fame of the person employed to write or to procure the registry of the bill of sale, can affect the title of his vendee.
There is not any thing, in the circumstance of the defendant not paying taxes on the slaves, till 1813 : he bought them in 1811, the taxes of that year, were probably paid by the vendor; those of 1812, were a charge on the vendee, and we all know that, according to the mode of collecting taxes, those of 1812 were not payable till 1813.
It is, therefore, ordered, adjudged and decreed, that the judgment of the parish court be affirmed with costs.
Scghers for the plaintiffs—Livingston for the defendant.